IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NETWORK-1 TECHNOLOGIES, INC.<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD. and SAMSUNG ELECTRONICS AMERICA, INC.;<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 2:25-cv-667-JRG<br><br>Jury Trial Requested |

**PLAINTIFF NETWORK-1'S OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS


I. Introduction ....... 1

II. Legal Principles of Claim Construction ....... 1

III. Overview of the Patented Technology ....... 2

IV. Terms for Construction ....... 4

A. "receiving the symmetric key" ('780 claim 1, '094 claim 1) ....... 4

1. The claims do not prohibit receiving the symmetric key from the subscription manager. ....... 5

2. The specifications disclose multiple embodiments—some of which receive the symmetric key from a source besides the subscription manager, while others do not. ....... 6

3. The IPR prosecution histories show the Patent Office implicitly rejected Samsung's proposed District Court construction. ....... 7

4. The extrinsic evidence shows the well-understood plain and ordinary meaning ....... 10

B. "cryptographic parameters" ('869 claims 1, 4, 18) ....... 10

1. The claims do not limit "cryptographic parameters" to "input settings." ....... 11

2. Samsung's proposed construction is unsupported by and contradicts the specification. ....... 13

a. No lexicography or disavowal. ....... 13

b. Samsung's construction would exclude disclosed embodiments. ....... 15

c. The specification does not exclude key values. ....... 18

3. The prosecution history supports the plain and ordinary meaning. ....... 21

4. The extrinsic evidence confirms the well-understood plain and ordinary meaning. ....... 22

V. Conclusion ....... 23

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Dey, L.P.*,
287 F.3d 1097 (Fed. Cir. 2002) .......... 22

*Ca, Inc. v. Netflix, Inc.*,
No. 2:21-CV-00080-JRG-RSP, 2021 U.S. Dist. LEXIS 221133 (E.D. Tex. Nov. 16, 2021) .... 7

*Cypress Lake Software, Inc. v. ZTE (USA) Inc.*,
2018 U.S. Dist. LEXIS 143743 (E.D. Tex. Aug. 23, 2018) .......... 6

*Google Inc. v. SimpleAir, Inc.*,
682 F. App'x 900 (Fed. Cir. 2017) .......... 8

*Hill-Rom Servs. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) .......... 6

*Kara Tech., Inc. v. Stamps.com, Inc.*,
582 F.3d 1341 (Fed. Cir. 2009) .......... 1

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) .......... 2

*Oatey Co. v. IPS Corp.*,
514 F.3d 1271 (Fed. Cir. 2008) .......... 7

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) .......... 19

*Orange Elec. Co. v. Autel Intelligent Tech. Corp.*,
No. 2:21-CV-00240-JRG, Dkt. 91 (E.D. Tex. Jan. 18, 2023) .......... 8, 22

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .......... 1, 2, 10

*Ramot at Tel Aviv Univ. Ltd. v. Cisco Sys.*,
No. 2:19-cv-00225-JRG, 2020 U.S. Dist. LEXIS 85561 (E.D. Tex. May 15, 2020) ......... 19, 22

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998) .......... 1

*Thorner v. Sony Comput. Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) .......... 6, 19

*Verizon Services Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) .......... 2, 7, 18

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ........ 1, 2, 7, 18

**Regulations**

37 C.F.R. § 42.104(b) ........ 21

## I. <u>Introduction</u>

Network-1's constructions are supported by both intrinsic and extrinsic evidence, and are consistent with the canons of claim construction. Samsung's constructions, conversely, attempt to avoid liability by reading limitations from the specifications into the claims. The Court should adopt Network-1's constructions and reject Samsung's overly-restrictive interpretations.

## II. <u>Legal Principles of Claim Construction</u>

Claim terms are construed according to their plain and ordinary meaning, *i.e.*, the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention" after having read the intrinsic record. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*).

Although the specification, prosecution history, and extrinsic evidence are available as tools for construing claim terms, "the claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (citations omitted). The specification may inform the meaning of a term, but it does not change that meaning unless the patentee has chosen to be his own lexicographer by clearly and unequivocally setting out his intended meaning. *See Phillips*, 415 F.3d at 1321; *Vitronics Corp. v. Conceptronic*, *Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996). Additionally, claims should not be interpreted by importing limitations from the specification into the claims. *See Kara Tech., Inc. v. Stamps.com, Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("[W]e will not … import a limitation from the specification into the claims.").

Similarly, claims are not limited to the preferred embodiment. *See id.* ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment . . ."). "[A]lthough the specification often describes very specific embodiments of the invention, we have

repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323; *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). Finally, patent claims are rarely interpreted "in a way that excludes disclosed examples in the specification." *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007); *Vitronics*, 90 F.3d at 1583 (a construction that excludes the preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support . . .").

## III. Overview of the Patented Technology

This case involves six patents, each of which was invented by John Nix based on research and development that he performed in late 2013. The Nix patents address how to securely provision and then authenticate cellular devices, such as mobile phones. The asserted patents fall into three families: (1) the eSIM Provisioning Patents (the '780, '094, and '893 Patents, Exs. 1-3); (2) the Cellular Authentication Patents (the '204 and '864 Patents, Exs. 4-5); and (3) the Combo Patent (the '869 Patent, Ex. 6), which combines both the eSIM provisioning and cellular authentication technologies. Only the '780, '094, and '869 Patents have disputed terms for construction.

The eSIM Provisioning Patents address how to securely load subscriber information onto an embedded SIM (or "eSIM"[1]) within a cellular device. Before the eSIM Provisioning Patents, cellular devices used a traditional subscriber identity module ("SIM") card, *i.e.*, a plastic-encased chip that was physically inserted into the mobile device and that could be removed and replaced with a different SIM card. *See* '780 at 2:35-41. These SIM cards were pre-loaded with various profile information used to authenticate the device within the cellular network. *Id.* at 2:42-52. But due to their physical nature, traditional SIM cards had many disadvantages that made them

---

[1] The Nix patents also refer to an eSIM as an embedded universal integrated circuit card, or "eUICC." '780 at 19:26-28.

unsuitable for remote locations, less convenient, more costly, and less secure. *Id.* at 2:61-3:12.

Because of the drawbacks with physical SIM cards, the industry began to consider replacing them with eSIMs. '780 at 3:13-17. With eSIMs, the authentication hardware is permanently embedded within the mobile device and cannot be removed. However, eSIMs are not typically pre-loaded with user- or device-specific profile information; rather, profile information must be electronically transferred to the eSIM via a remote network. *See id.* at 3:31-4:38. The eSIM Provisioning Patents provide a framework for securely transferring that profile information—especially in the context of a distributed network controlled by multiple different parties. *See id.* at 4:42-8:40.

More specifically, the eSIM Provisioning Patents describe dividing the profile information into two portions, and then encrypting/decrypting each portion using a different key that was obtained in a different manner. '780 at Fig. 2a, 29:47-30:8. The first portion (ciphertext 208a) is encrypted/decrypted with a profile key 107b that was derived using a key-exchange algorithm. *Id.* at 30:48-58, 34:38-53, 38:20-26. The second portion (ciphertext 208b) is encrypted/decrypted with a separate symmetric key 127 that the device received via the network. *Id.* at 32:40-45, 36:53-55. Claim 1 of the '780 and '094 Patents recites this approach: the eSIM "deriv[es] a profile key using a key exchange algorithm," "receiv[es] the symmetric key," and uses each key to decrypt its respective portion of the encrypted profile. '780 at 80:27-62; '094 at 80:32-67. "[R]eceiving the symmetric key" is the first disputed term.

Once a device is provisioned, the network must authenticate it. In prior 3G and 4G networks, cellular devices sent their identity to the network as unencrypted plaintext, which permitted a nefarious third party to intercept it and assume the device's identity. *See* Ex. 7 (CableLabs) at 6. The Cellular Authentication Patents solve this security problem. First, the

cellular device derives its own private/public key pair. ‘204 at 100:46-48. That device then derives a symmetric key from that private key and the network’s public key, and uses that key to encrypt its identity before sending it. *Id.* at 100:49-57. Finally, the network derives the same key and decrypts the data, so the device’s identity is never exposed in plaintext. *Id.* at 100:58-65.

The ‘869 Combo Patent combines the concepts from both the eSIM Provisioning and Cellular Authentication Patents. Claim 1 begins with eSIM provisioning: the device stores keys, receives an encrypted profile comprising “cryptographic parameters,” and decrypts it using a key derived through a key exchange. ‘869 at 148:4-19. It ends with secure cellular authentication steps: the device generates a new key pair, derives a symmetric key using a second key exchange and the cryptographic parameters, and sends its module identity to the network in encrypted form. *Id.* at 148:20-32. “[C]ryptographic parameters” is the second disputed term.

## IV. Terms for Construction

The Parties dispute two terms found in just three of the Asserted Patents. Network-1’s constructions satisfy the legal claim construction principles discussed above. Samsung’s constructions, on the other hand, repeatedly violate those principles in a transparent attempt to avoid infringement.

### A. “receiving the symmetric key” (‘780 claim 1, ‘094 claim 1)

| Network-1’s Construction | Samsung’s Construction |
| --- | --- |
| Plain and ordinary meaning | “(g) receiving the symmetric key **from a source other than the subscription manager**” |

This term is readily understood to persons of skill per its plain and ordinary meaning; there is no need for a formal construction. The Court certainly should not adopt Samsung’s construction, which does nothing to define the term itself, but instead merely rewrites the claim to add a negative limitation that comes from one preferred embodiment, while ignoring other embodiments.

1. *The claims do not prohibit receiving the symmetric key from the subscription manager.*

The disputed term, highlighted in yellow below, appears in independent claims 1 of the '780 Patent (apparatus) and the '094 Patent (method), which in pertinent part have identical text:

> "(a) generating a first message comprising:
>
> (1) an identity of the embedded universal integrated circuit card;
>
> (2) a nonce; and
>
> (3) a first digital signature, generated using a first eUICC private key, wherein the first eUICC private key corresponds to a first eUICC public key;
>
> (b) sending the first message via a network application to a subscription manager system;
>
> (c) deriving a second eUICC private key and a corresponding second eUICC public key using a first random number generator and a first set of cryptographic algorithms;
>
> (d) storing a subscription manager public key which corresponds to a subscription manager private key;
>
> (e) deriving a profile key using a key exchange algorithm based on at least:
>
> (i) the second eUICC private key, and
>
> (ii) the stored subscription manager public key,
>
> wherein the profile key can also be derived at the subscription manager system based at least on:
>
> (iii) the second eUICC public key, and
>
> (iv) the subscription manager private key;
>
> (f) receiving from the subscription manager system, an encrypted profile comprising a ciphertext including a key K encrypted with a symmetric key;
>
> (g) receiving the symmetric key;
>
> (h) decrypting, by the embedded universal integrated circuit card, at least a portion of the encrypted profile using the profile key;
>
> (i) decrypting, by the embedded universal integrated circuit card, at least a portion of the ciphertext using the symmetric key; and
>
> (j) storing at least the key K in the embedded universal integrated circuit card for use in future communications."

'780 at 80:27-62; '094 at 80:32-67.[2]

[2] All emphasis has been added unless otherwise noted.

For some limitations, the claims explicitly specify the source from which certain information is received. For example, limitation 1(f) of the '780 Patent recites: "(f) *receiving from the subscription manager system*, an encrypted profile comprising a ciphertext including a key K encrypted with a symmetric key." '780 at 80:50-52; *see also* '094 at 80:55-57. But for other terms—including term 1(g) at issue here—the claims are silent as to the source, and instead only recite a particular operation: "(g) *receiving* the symmetric key." '780 at 80:53; '094 at 80:58. Thus, the patentee knew how to draft narrow limitations that identify a specific source of information, but deliberately chose not to do so for this disputed term. Accordingly, a POSITA would not understand the claims to limit the source of the symmetric key and/or prohibit the symmetric key from being received from a subscription manager, as Samsung proposes. Ex. 8 (hereinafter, "Sundaresan Decl."), ¶23.

Samsung's construction impermissibly re-writes the claims, and narrows them in a manner that is contrary to a plain reading and a POSITA's understanding. *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365-67 (Fed. Cir. 2012); *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1371-72 (Fed. Cir. 2014); *Cypress Lake Software, Inc. v. ZTE (USA) Inc.*, 2018 U.S. Dist. LEXIS 143743, at *89-90 (E.D. Tex. Aug. 23, 2018) (rejecting defendant's narrowing construction for improperly reading a limitation into the claims where the intrinsic evidence showed that the patentee knew how to claim that limitation, but chose not to do so). The Court should reject it.

2. *The specifications disclose multiple embodiments—some of which receive the symmetric key from a source besides the subscription manager, while others do not.*

The patent specifications disclose multiple embodiments. Some embodiments teach that the mobile device receives the symmetric key from a source besides the subscription manager (*e.g.*, the mobile network operator). '780 at 59:52-60 ("*In exemplary embodiments*, the MNO 104 can

send the symmetric key 127 in a step 309 through the wireless network 102…. [T]he symmetric key 127 can be securely sent by MNO 104 and received by module 101."). Importantly, the specifications are clear that those are only "exemplary embodiments" that do not impose a mandatory requirement for the mobile network operator to provide the symmetric key. *Id.* The specification reinforces that by disclosing other embodiments where "mobile network operator 104 could operate the eUICC subscription manager 109." *Id.* at 11:36-38; *see also id.* at 37:41-42 ("the MNO 104 could also function as a eUICC subscription manager 109"). And in those embodiments where the mobile network operator and the subscription manager are the same, the source from which the mobile device receives the symmetric key is no longer germane. *See* Sundaresan Decl., ¶¶26-27.

Samsung's construction simultaneously commits two cardinal sins of claim construction: (1) it imports limitations from one preferred embodiment (receiving the symmetric key from only the mobile network operator and not from the subscription manager); while (2) excluding the teachings of another embodiment (receiving the symmetric key from the combined subscription manager/mobile network operator entity). *See Vitronics*, 90 F.3d at 1583; *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008); *Verizon Servs. Corp.*, 503 F.3d at 1305; *Ca, Inc. v. Netflix, Inc.*, No. 2:21-CV-00080-JRG-RSP, 2021 U.S. Dist. LEXIS 221133, at *27-28 (E.D. Tex. Nov. 16, 2021) (rejecting defendant's construction that imported a limitation drawn from one disclosed embodiment because it would improperly exclude another preferred embodiment). Such a construction cannot be legally correct for either of these reasons.

3. *The IPR prosecution histories show the Patent Office implicitly rejected Samsung's proposed District Court construction.*

Samsung petitioned for *inter partes* review of both the '780 and '094 Patents. In each of those IPRs, this same issue arose regarding the source of the symmetric key—albeit in the context

of priority dates and not claim construction. More specifically, in each IPR Petition, Samsung alleged that there was no written description in either the '780 or '094 specifications for receiving the symmetric key from a subscription manager (only from a mobile network operator), so those patents were not entitled to their earliest priority date:

> [T]he '780 Patent and its predecessors make clear that it is the MNO that sends the symmetric key to the eUICC, to ensure that the MNO maintains control over the release of its network access key K. However, *the claims of the '780 Patent place no limit on the source of the claimed "symmetric key,"* and, in the parties' district court litigation, PO has taken the position that the eUICC receives the symmetric key not from the MNO, but from the subscription manager—the very entity that the '780 Patent teaches against providing with ultimate control over the release of the MNO's credentials. Because none of the applications in the '780 Patent's priority chain provides any written description support for the scope of its claims, the '780 Patent is entitled to a priority date no earlier than its filing date: June 26, 2019.

Ex. 9 ('780 IPR Petition) at 9-10 (internal citations omitted); *see also* Ex. 10 ('094 IPR Petition) at 9-10.

As part of this § 112 argument, Samsung told the PTAB that the claims of the '780 and '094 Patents "place no limit on the source of the claimed 'symmetric key.'" *Id.* Samsung's priority argument depended on that premise: Samsung contended that, because the claims do not limit the source, they cover receiving the symmetric key from the subscription manager, which Samsung said the earliest applications did not support. *Id.* Before this Court, however, Samsung is taking a directly opposite position on the meaning of limitation 1(g) by arguing that limitation 1(g) places a limit on the source of the symmetric key as coming exclusively from the mobile network carrier (MNO). Samsung's inconsistency in its claim construction positions between this Court and the US Patent Office is telling. *See Google Inc. v. SimpleAir, Inc.*, 682 F. App'x 900, 904–05 (Fed. Cir. 2017) ("A party's argument should not be a moving target."); *Orange Elec. Co. v. Autel Intelligent Tech. Corp.*, No. 2:21-CV-00240-JRG, Dkt. 91, at 7–9 (E.D. Tex. Jan. 18, 2023)

(rejecting defendant's proposed construction where it improperly narrowed the claim language and ran contrary to the position defendant had taken in its petition for inter partes review).

In response to Samsung's IPR Petition, Network-1 identified to the PTAB where the specifications taught receiving the symmetric key from a subscription manager:

> [The patent specifications] teach that the "mobile network operator 104 could operate the eUICC subscription manager 109." [Nix Priority Application] at 25; *see also id*. at 65 ("the MNO 104 could also function as a eUICC subscription manager 109"). Thus, because the '780 priority applications teach the mobile network operator and the subscription manager can be the same, there is ample written description for receiving a symmetric key from a subscription manager. Hence, the '780 Patent is entitled to its earliest December 6, 2013 priority date[.]

Ex. 11 ('780 IPR Preliminary Response) at 38-39; *see also* Ex. 12 ('094 IPR Preliminary Response) at 38 (substantively identical).

After considering these arguments, the PTAB ultimately sided with Network-1 and denied Samsung's IPRs. Ex. 13 ('780 and '094 IPR Institution Decisions) at 2 ("*<u>[A]fter review of the merits</u>*, the petitioner has failed to show a reasonable likelihood of prevailing with respect to at least one claim challenged in the petition).

In light of the above IPRs, a POSITA would not understand the '780 or '094 claims to be limited to receiving the symmetric key from a source other than the subscription manager. Sundaresan Decl., ¶51. Rather, due to Samsung's own representation that the claims place no limit on the source of the symmetric key, and the specifications' disclosure of embodiments in which the mobile network operator also functions as the subscription manager, a POSITA would broadly interpret the claims to permit receiving the symmetric key from the subscription manager. *See id.*

Samsung's construction erroneously conflicts with the prosecution histories and contradicts its own representations to the PTAB. Thus, Samsung's construction should be rejected for this additional reason. *See Google*, 682 F. App'x at 904–5.

#### 4. *The extrinsic evidence shows the well-understood plain and ordinary meaning*

The extrinsic evidence shows that this term has a plain and ordinary meaning. For example, a lay dictionary defines "receive" as "to take or acquire (something given or offered); get or be given." Ex. 14 (American Heritage Dictionary). And a relevant technical website describes a "symmetric key" as follows: "In cryptography, a symmetric key is one that is used both to encrypt and decrypt information. This means that to decrypt information, one must have the same key that was used to encrypt it. The keys, in practice, represent a shared secret between two or more parties that can be used to maintain a private information link." Ex. 15 (Thales) at 2. A POSITA recognizes that the '780 and '094 Patents use the term "receiving the symmetric key" consistent with the extrinsic evidence cited above. Sundaresan Decl., ¶52. Certainly nothing in the above extrinsic evidence suggests that a symmetric key cannot be received from a subscription manager. *Id.*

Only Network-1's construction is consistent with the extrinsic evidence; Samsung's wrongly contradicts that evidence. Accordingly, the Court should adopt Network-1's construction and reject Samsung's construction. *See Phillips*, 415 F.3d at 1317-19, 1322-23.

### B. "cryptographic parameters" ('869 claims 1, 4, 18)

| Network-1's Construction | Samsung's Construction |
|---|---|
| Plain and ordinary meaning | "**input settings for cryptographic algorithms**" |

Persons of skill understand this term according to its plain and ordinary meaning, so there is no need for a formal construction. The patentee did not define this term or disavow claim scope, and the specification uses the term expansively. Samsung's construction replaces the claim term entirely with two narrower words ("input settings") that appear nowhere in the claims or the specification. They also add a stated purpose for the "cryptographic parameters"—requiring use in "cryptographic algorithms." But Samsung's real purpose is revealed by its expert's declaration: to impose an unstated negative limitation that prohibits any "key" from being a cryptographic

parameter. That is the opposite of what Samsung and the same expert told the Patent Office in Samsung's IPR petition, where they represented that a POSITA would understand "cryptographic keys" to be "cryptographic parameters." Samsung's attempt to narrow the scope of this claim term is unsupported by the claims, the specification, the prosecution history, and the extrinsic evidence; it should be rejected.

*1. The claims do not limit "cryptographic parameters" to "input settings."*

The relevant portions of '869 claim 1 are presented below to highlight the disputed term:

> 1. A method for a mobile device with an embedded universal integrated circuit card (eUICC) to securely communicate with a wireless network, the method performed by the mobile device, the method comprising:
> ...
> b) receiving, from a first server associated with the wireless network, an encrypted profile for the eUICC comprising cryptographic parameters, a module identity, and a key K;
> ...
> g) generating a symmetric key using a second ECDH key exchange with the second module private key and the cryptographic parameters;
> ....

'869 at 148:4-31.

Importantly, '869 claim 1 does not limit the "cryptographic parameters" to any particular values or value-types, including "input settings." Rather, it requires that the claimed parameters be received from a first server in an encrypted profile (limitation 1(b)) and then, using a second ECDH key exchange with the parameters, generate a symmetric key (limitation 1(g)). *Id.*

The patentee used precise vocabulary throughout claim 1, including "module private key," "network public key," "shared secret key," "symmetric key," and "key K," and the specification separately describes a "set of cryptographic algorithms 141." The patentee nonetheless chose the broader term "cryptographic parameters" for what information the profile includes. And, as shown below, the specification's cryptographic parameters may include values that govern protocols related to the algorithms—server and certificate-authority addresses, authentication steps, and

token and certificate policy—none of which is an "input setting for" any algorithm. Samsung's attempt to limit "cryptographic parameters" to "input settings" should be rejected.

The dependent claims also show the impropriety of Samsung's proposed construction. For example, dependent claim 4 states:

> 4. The method of claim 1, wherein the cryptographic parameters comprise an identifier for a set of cryptographic parameters.

'869 at 148:37-39. A person of skill in the art would not understand an "identifier for a set of cryptographic parameters" as necessarily conforming to "input settings for cryptographic algorithms." Rather, the specification uses the claim's own words to describe a token that stands in for the parameter set: a packet "could contain the token 126c as an identifier for a set of cryptographic parameters 126." *Id.* at 102:25-29. The token is a label, not a setting: "the use of a set of cryptographic parameters token 126c can be substituted for communicating a complete list of cryptographic parameters 126." *Id.* at 132:33-37. Samsung's proposed construction imposes nonsensical constraints on claim 4 (*i.e.*, that an identifier for a set of cryptographic parameters be an input setting for cryptographic algorithms) and should be rejected.

Further, dependent claim 18 also warrants against Samsung's construction:

> 18. The method of claim 1, wherein the cryptographic parameters include a base point G for an elliptic curve.

'869 at 149:15-16. A base point is not a "setting." It is a fixed point on the elliptic curve that the ECDH computation multiplies by a private key to generate the public key (Q = dG). It is one of the numbers the arithmetic is performed on, not a choice about how the algorithm is configured. *See* Ex. 16 (hereinafter "SEC-1") at SAMS396-0130824. The specification treats the base point exactly that way, listing base point G among the "numbers" input to the key derivation function. *See* '869 at 33:13-24, 33:47-50, Fig. 11.

Samsung's own extrinsic evidence confirms the point. Dr. Rangan relies on SEC-1 for the proposition that "parameters" merely "determine the setting in which the arithmetic is performed" and "are not the quantities on which it operates." Ex. 17 (hereinafter, "Rangan Decl.") ¶ 102. But he then acknowledges that SEC-1 lists the base point G as one of the elliptic curve domain parameters, *id.* ¶ 103 (citing SEC 1 § 3.1.1), and that SEC 1's ECDH primitive takes those domain parameters as an input and computes the shared secret from them together with the parties' keys, *id.* ¶ 105 (quoting SEC 1 § 3.3.1). On Samsung's own reference, then, the base point G is both a "parameter" and a quantity the arithmetic operates on. Dr. Rangan's premise is contradicted by the source he cites for it—and claim 18 adopts SEC 1's usage by placing G among the "cryptographic parameters." Claim 18 thus confirms that "cryptographic parameters" include values an algorithm computes with, not merely settings that configure it.

2. *Samsung's proposed construction is unsupported by and contradicts the specification.*

Samsung's proposed "input settings" limitation appears nowhere in the specification—it is the intersection of two concepts (inputs and settings) that are discussed separately in the specification. The specification does not separately define or limit the term "cryptographic parameters." Samsung's construction also excludes specification embodiments. Finally, the specification includes embodiments with "key" values as cryptographic parameters, confirming that Samsung's implicit exclusion is improper.

*a. No lexicography or disavowal.*

The specification contains no lexicography or disavowal regarding "cryptographic parameters." Samsung has failed to identify any specification passages that limit the term to "input settings" or stating that "keys" cannot be "cryptographic parameters." Rather, the specification describes "cryptographic parameters" broadly and in various contexts to support cryptographic decisions and operations. In fact, the specification uses the term "cryptographic parameters"

approximately 360 times. *See* Sundaresan Decl. ¶ 59; *id.* ¶ 61 (collecting relevant passages from the specification). None of these passages limit the term to "input settings" as proposed by Samsung. *Id.* And Samsung's expert, Dr. Rangan, has not identified any definition or disavowal—because none exists.

The specification characterizes "cryptographic parameters" generically, using open categories such as data, information, values, and fields—not "input settings." *See* '869 at 85:56-60 ("As described in FIG. 1d, FIG. 1i, and elsewhere herein, *parameters 126 can include <u>data</u> useful for the operation of cryptographic algorithms* 141 and module public key 111."); *id.* at 33:56-58 ("Cryptographic parameters 126 *can also include other or additional <u>information</u>* for using a key derivation function 141f . . . ."); *id.* at 43:4-8 ("The *exemplary values* for a set of cryptographic parameters 126 are shown in FIG. li to be *illustrative as opposed to limiting*, and *other <u>values</u> or <u>fields</u> for a set of cryptographic parameters 126* are possible as well without departing from the scope of the present invention.").

Samsung's expert relies on select specification passages to identify three purported characteristics of "cryptographic parameters"—namely, that they are: (1) inputs; (2) settings; and (3) *configuration* values, not *key* values. *See* Rangan Decl. ¶¶ 83-85. For the "inputs" characterization, he relies on passages from columns 31-33. *See id.* ¶ 81 (citing 31:7-11, 32:1-7, 32:26-30, 32:52-60, 33:65-34:2). For the "settings" characterization, he relies on different passages. *See id.* ¶ 84 (citing 76:31-45, 97:38-52). While these passages characterize some "cryptographic parameters" as "inputs" or "settings," the specification never characterizes the parameters as "input settings," nor limits "cryptographic parameters" to only inputs or settings. Rather, it describes cryptographic parameters as inputs, or settings, or values, and the disclosed universe of parameters is the union of those descriptions. However, Samsung's construction

requires *every* parameter to be both an input *and* a setting—limiting the parameters to a subset of those disclosed by the specification. The one sentence that uses both words treats settings as a species of parameter, not a definition. *See* '869 at 31:7-11 ("A set of cryptographic parameters 126 can include input into asymmetric ciphering algorithms 141a, such as, but not limited to, specifying key lengths, elliptic curves to utilize (if ECC), modulus (if RSA) *or other parameters or settings required*.").

Dr. Rangan himself declines to apply his own conjunction literally: "the word 'input' does not require that each individual parameter be a numeric operand directly consumed by a mathematical step; many of the specification's examples are selections among options rather than numeric values." Rangan Decl. ¶ 86. That concession leaves Samsung with a dilemma. Either (1) "input settings" means what it says—in which case it excludes the disclosed parameters that are settings but not inputs, as well as those that are inputs but not settings—or (2) "input" does no work except to carry Samsung's unstated (and improper) exclusion of keys. Neither alternative supports adopting it.

*b. Samsung's construction would exclude disclosed embodiments.*

Samsung's proposed construction improperly excludes various parameters that are disclosed in various embodiments. For example, Figure 1i of the specification provides an exemplary set of cryptographic parameters. *See* '869 at Fig. 1i, 10:64-67; Sundaresan Decl. ¶ 60. An excerpt of Figure 1i is reproduced below with highlighting to show the cryptographic parameters that would be excluded under Samsung's construction:




'869 at Fig. 1i (excerpted and annotated). The blue boxes highlight "settings" that are not "inputs" to any cryptographic algorithm, and the red box highlights "inputs" that are not "settings." Samsung's proposed construction of "input settings" would exclude these disclosed cryptographic parameters—some of which are settings but not inputs, and others that are inputs but not settings. A key-pair validity window of "365 days," a "Mandatory" security token, or "Certificate Required: No" is a setting, but nothing feeds it into cryptographic algorithms. Those entries tell the module and server how to conduct their exchange—when a key pair expires and must be replaced, whether a message must carry a security token, whether a certificate must be sent—not how any cryptographic algorithm computes its result.

Conversely, the "Equation Values: p, a, b, g, n" are inputs, but not settings. According to Dr. Rangan, a setting can be a selection among options rather than a numeric value. Rangan Decl. ¶ 86. The equation values from the specification are not a selection among options. They are the numbers that define the elliptic curve itself, and every elliptic-curve computation uses them. *See* '869 at 34:28-30. These numbers are provided, for example, when the parties use a custom curve rather than selecting a named one from the "Standard Equations" row above it. *See id.* at 34:34-39 (standard curve 138 is "a name and/or values for a standardized curve"). Finally, the named curve equations ("sect239k1 …") and the token "Set 'A'" are identifiers—neither inputs nor settings—of the kind claim 4 recites.

The specification includes additional examples of "cryptographic parameters" that would be excluded from Samsung's proposed construction. The following lists exemplary "cryptographic parameters" that are settings but not inputs:

- a "name or address of a certificate authority" and "other names and addresses of servers," including which server to contact first to obtain a symmetric key ('869 at 45:43-54);
- "the method of authentication for a derived module public key" and "steps or values for a module 101 to authenticate the new, derived module public key 111 with a server 105" (*id.* at 44:54-56, 45:1-3);
- "values for a module 101 to authenticate or communicate with one or multiple wireless networks" (*id.* at 46:36-44);
- the "source" of new keys (*id.* at 45:55-60);
- certificate validity start and end times (*id.* at 47:22-23).

And the following list illustrates "cryptographic parameters" that are inputs but not settings:

- the base point G (*id.* at Fig. 11, 33:47-50);
- the Diffie-Hellman values p and g (*id.* at 140:64-141:1);
- random-number-generator "seed 128b, or a module seed file 139" (*id.* at 45:60-64);

- the algorithm token 190 used "as a cipher key" (*id.* at 38:53-57, 142:21-24, 146:29-34);
- the "number from … a set of cryptographic [parameters]" that is one of the KDF's two operands (*id.* at 33:13-24).[3]

A construction that excludes disclosed embodiments is rarely, if ever, correct—yet Samsung's construction excludes embodiments on both sides of its conjunction of inputs and settings. *See Vitronics*, 90 F.3d at 1583; *Verizon*, 503 F.3d at 1305; *see also* Sundaresan Decl. ¶¶ 63-66 (identifying cryptographic parameters that are not "input settings").

c. *The specification does not exclude key values.*

Samsung's construction ultimately seeks to impose a negative limitation as well—that "cryptographic parameters" cannot include key values. Dr. Rangan's declaration makes this clear. *See* Rangan Decl. ¶ 80 ("Samsung's construction captures that relationship: the parameters configure the algorithm, whereas the key is the result."); *id.* ¶ 83 ("I do not see any descriptions of algorithms producing the parameters. Instead, the parameters go in; the keys come out."); *id.* ¶ 85 ("[E]very example of a 'cryptographic parameter' disclosed in the specification is a ***configuration*** value rather than a ***key*** value."); *id.* ¶ 86 ("Instead, 'input' distinguishes the parameters from the values the cryptographic operations produce or protect—the keys, the derived shared secret, and the ciphertext."). However, as detailed below, Samsung's proposed exclusion is improper because the specification teaches that "cryptographic parameters" can include keys. And even apart from that teaching, a construction that carves a category of values out of a term's ordinary meaning is a negative limitation, which the Federal Circuit will not import absent "express disclaimer or independent lexicography in the written description that would justify adding [a] negative

[3] The quoted sentence reads "a set of cryptographic algorithms 126." The number 126 denotes the set of cryptographic parameters throughout the specification, *see, e.g.*, '869 at 34:18-23, and the word "algorithms" in this sentence is an evident typographical error.

limitation." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003); *see also Thorner*, 669 F.3d at 1365-67. Samsung identifies neither.

Indeed, Samsung and its expert have already told the Patent Office that keys are cryptographic parameters. In its IPR petition against the '869 Patent, Samsung argued that the prior-art Nakhjiri reference's encrypted profile—including its "cryptographic keys"—would have been understood to be the claimed "cryptographic parameters." *See* Ex. 18 ('869 IPR Pet.) at 32 ("Nakhjiri's encrypted profile includes 'security application algorithm codes, data and *cryptographic keys*', which a POSITA would have understood to be 'cryptographic parameters' . . . ." (internal citation omitted)); Ex. 19 (hereinafter, "Rangan IPR Decl.") ¶ 94 (same). Dr. Rangan thus testified to the PTO that a POSITA "would have understood" a profile's cryptographic keys to be cryptographic parameters. He now testifies to this Court that a POSITA "would not have regarded 'cryptographic parameters' as a term capable of encompassing a cryptographic key." Rangan Decl. ¶ 108. Both opinions were offered under the same *Phillips* standard; they cannot both be right. The earlier one was given before Samsung had an infringement-driven construction to defend, and the later opinion is entitled to no weight. *See Ramot at Tel Aviv Univ. Ltd. v. Cisco Sys.*, No. 2:19-cv-00225-JRG, 2020 U.S. Dist. LEXIS 85561, at *35 (E.D. Tex. May 15, 2020) ("Defendant's explanation of the inconsistency between its position before the PTAB and its position before the Court is not credible.").

The specification confirms what Samsung told the Patent Office. Dr. Rangan's analysis focuses on five of the cryptographic algorithms depicted in Figure 1d and mentions two others in passing. *See* Rangan Decl. ¶¶ 81, 83 (citing '869 at 30:47-62). However, he fails to address the shared secret algorithm 141g and secret ciphering algorithm 141h, each of which accepts a "key" as an input. Nor does he acknowledge that the algorithms he does discuss take keys as inputs—a

point he concedes elsewhere. *See id.* ¶ 80 (claim 1(g) "recites two separate inputs to the ECDH operation—a key and a set of parameters"); *id.* ¶ 105 (SEC 1's ECDH primitive takes a private key and a public key as inputs).

The shared secret algorithm 141g and secret ciphering algorithm 141h both accept an algorithm token 190 as an input. *See* '869 at 34:66-35:3 ("shared secret algorithm 141g can comprise an algorithm to accept input from . . . (ii) an algorithm token 190"); *id.* at 35:5-9 ("secret ciphering algorithm 141h can comprise an algorithm to accept input from . . . (ii) an algorithm token 190 as a key"). This "algorithm token 190" is a cipher key. *See id.* at Fig. 1g (labeling algorithm token 190 as a "Cipher Key"). And the specification repeatedly refers to the algorithm token 190 as a key. *See id.* at, *e.g.*, 35:8-9 ("an algorithm token 190 as a key"); *id.* at 35:13-16 ("A secret ciphering algorithm 141h can also be used as a symmetric ciphering algorithm 141b, where the logic and/or steps for *using a key such as, but not limited to an algorithm token 190*, remain secret and/or are not publicly shared."); *id.* 38:53-63 (describing secret ciphering algorithms 161 and 162 each as "using input of (i) an algorithm token 190 as a cipher key").

The specification also explains that this same "algorithm token 190" (which can be a key) is a cryptographic parameter. *See* '869 at 142:21-24 ("An ***a****lgorithm token 190 for use with a shared secret algorithm 141g* in a module key K derivation algorithm 909 *can be included in a subset of cryptographic parameters 126a*."). The specification further explains that: "An algorithm token 190 for use with a shared secret algorithm 141g in a network key K derivation algorithm 1101 can be included in a subset of cryptographic parameters 126a, and the subset of cryptographic parameters 126a could be included in the received eUICC profile 311 for a module 101." *Id.* at 146:29-34. Thus, the specification teaches that a key (algorithm token 190) may be included as part of the cryptographic parameters that are delivered in a profile for use in deriving a shared

key—mirroring the steps recited by claims limitations 1(b) and 1(g). That the token may be "a temporary value . . . that may preferably only be used once" ('869 at 36:52-55) does not change its character. A one-time symmetric key is still a key, and the patentee chose the words "key" and "cipher key" to describe it. Samsung's proposed exclusion directly contradicts the specification's teachings and should be rejected.

3. *The prosecution history supports the plain and ordinary meaning.*

The '869 Patent file history contains no substantive statements regarding "cryptographic parameters." The examiner did not issue any §102 or §103 rejections based on the claims, and a double-patenting objection was overcome by terminal disclaimer. Thereafter, the claims were allowed. *See* Sundaresan Decl. ¶¶ 67-74. The patentee did not disavow any claim scope regarding "cryptographic parameters."

Network-1 served its infringement contentions on September 30, 2025. Almost two months later on November 20, 2025, Samsung filed an IPR against the '869 Patent. *See* Ex. 18 ('869 IPR Pet.) at 83. In that Petition, Samsung told the PTO that the claims should be interpreted according to their plain and ordinary meaning. *See id.* at 9; Rangan IPR Decl. ¶ 59 ("I do not believe that any term requires explicit construction . . . ."); *see also* 37 C.F.R. § 42.104(b) ("[T]he petition must set forth: . . . (3) How the challenged claim is to be construed."). Samsung knew Network-1's infringement contentions more than a month before filing its IPR. Nonetheless, it is now proposing different claim constructions than it proposed to the PTO.

And, as discussed above, Samsung and Dr. Rangan told the PTO in that same petition that a prior-art profile's "cryptographic keys" are "cryptographic parameters"—the opposite of what they tell this Court. *See* Ex. 18 ('869 IPR Pet.) at 32; Rangan IPR Decl. ¶ 94. The pattern is telling: one construction for the PTO, another for this Court, and the exclusion of keys surfaced for the first time in an expert declaration after Samsung declined to identify it in the P.R. 4-2(c) meet and

confer. That gamesmanship is another reason to reject Samsung's proposed construction. *See Orange Elec. Co. v. Autel Intelligent Tech. Corp.*, No. 2:21-CV-00240-JRG, Dkt. 91, at 7–9 (E.D. Tex. Jan. 18, 2023) (rejecting defendant's proposed construction where it improperly narrowed the claim language and ran contrary to the position defendant had taken in its petition for inter partes review); *Ramot*, 2020 U.S. Dist. LEXIS 85561, at *35.

Finally, Samsung's reliance on the '401 Application is inapposite. *See* Rangan Decl. ¶¶ 90-94. That application is from a different family and is not in the priority chain for the '869 Patent. Incorporation by reference does not import the prosecution history of that same application. *See Abbott Labs. v. Dey, L.P.*, 287 F.3d 1097, 1104-05 (Fed. Cir. 2002). Nonetheless, the arguments made to the PTO regarding Xu change nothing. In making those arguments, the applicant added the following claim limitation: "receiving a set of parameters, wherein the set of parameters includes a value for an elliptic curve and a key length." Ex. 20 ('401 OA Resp.) at SAMS396-0131463. The applicant's distinction regarding parameters related to the lack of the required "value for an elliptic curve and a key length." *See id.* at SAMS396-0131476. The applicant distinguished Xu for lacking specific parameters; the applicant did not state that a key can never be a parameter.

4. *__The extrinsic evidence confirms the well-understood plain and ordinary meaning.__*

The extrinsic evidence shows that this term has a plain and ordinary meaning. For example, a lay computer and internet dictionary defines "Parameter" as "1. Characteristic. For example, specifying parameters means defining the characteristics of something. In general, parameters are used to customize a program. For example, filenames, page lengths, and font specifications could all be considered parameters. 2. In programming, the term parameter is synonymous with argument, a value that is passed to a routine." Ex. 21 (Computer & Internet Dict.). A value passed to a cryptographic routine is a cryptographic parameter; nothing limits the term to "input settings."

Dr. Rangan rewrites definition 2 as a value passed "to configure how it behaves." *See* Rangan Decl. ¶ 109.

Dr. Rangan's reliance on SEC-1 is unavailing. It does not mention "cryptographic parameters" or "input settings." Samsung relies on its description of "elliptic curve domain parameters"—a term of art for the numbers that define a curve (p, a, b, G, n, h), and at most a subset of what the '869 Patent calls cryptographic parameters. *See* Sundaresan Decl. ¶ 84; Rangan Decl. ¶¶ 102-106. And SEC 1 itself treats the base point G—a domain parameter—as an input the ECDH primitive computes with, *see* Rangan Decl. ¶ 105 (quoting SEC 1 § 3.3.1), contrary to Dr. Rangan's assertion that domain parameters "are not the quantities on which it operates." *Id.* ¶ 102. Similarly, the Boyd-Mathuria book does not mention "cryptographic parameters" or "input settings." *See* Sundaresan Decl. ¶ 83.

For the reasons stated above, the Court should adopt the plain and ordinary meaning for "cryptographic parameters," just as Network-1 proposes now and just as Samsung proposed to the PTO less than one year ago.

## V. <u>Conclusion</u>

For all these reasons, the Court should adopt Network-1's constructions and reject Samsung's.

Dated: November 2, 2026

Respectfully submitted,

*/s/ Eric J. Enger*
Demetrios Anaipakos
Texas Bar No. 00793258
danaipakos@aatriallaw.com
Amir H. Alavi
Texas Bar No. 00793239
aalavi@aatriallaw.com
Michael McBride
Texas Bar No. 24065700
mmcbride@aatriallaw.com
Christopher Ryan Pinckney
Texas Bar No. 24067819
rpinckney@aatriallaw.com
Connie Flores Jones
Texas Bar No. 00793736
cfloresjones@aatriallaw.com
Steve Jugle
Texas Bar No. 24083280
sjugle@aatriallaw.com
**ALAVI & ANAIPAKOS PLLC**
609 Main St, Suite 3200
Houston, Texas 77002
Telephone: (713) 751-2362
Facsimile: (713) 751-2341

Michael Heim
Texas Bar No. 09380923
mheim@hpcllp.com
Eric James Enger
Texas Bar No. 24045833
eenger@hpcllp.com
R. Allan Bullwinkel
Texas Bar No. 24064327
abullwinkel@hpcllp.com
William Brown Collier, Jr.
Texas Bar No. 24097519
wcollier@hpcllp.com
**HEIM, PAYNE & CHORUSH, LLP**
609 Main St., Suite 3200
Houston, Texas 77002
Telephone: (713) 221-2000
Facsimile: (713) 221-2021

Andrea L. Fair
State Bar No. 24078488
andrea@millerfairhenry.com
Claire A. Henry
State Bar No. 24053063
claire@millerfairhenry.com
**MILLER FAIR HENRY PLLC**
1507 Bill Owens Parkway
Longview, Texas 75604
(903) 757-6400 (telephone)

**ATTORNEYS FOR NETWORK-1 TECHNOLOGIES, INC.**

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that, on November 2, 2026, a copy of the foregoing was served electronically through the U.S. District Court, Eastern District of Texas ECF system to all counsel of record who are Filing Users of the Court's Electronic Filing System.

*/s/ Eric J. Enger*
Eric J. Enger