**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

NETWORK-1 TECHNOLOGIES, INC.,

*Plaintiff*

v.

SAMSUNG ELECTRONICS CO., LTD.,
SAMSUNG ELECTRONICS AMERICA, INC.,
*Defendants*.

Case No. 2:25-cv-00667-JRG-RSP

**JURY TRIAL DEMANDED**

# DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

Page


I. INTRODUCTION ........................................ 1

II. BACKGROUND: ESIM TECHNOLOGY ........................................ 2

III. THE DISPUTED TERMS OF THE ’780 AND ’094 PATENTS ........................................ 3

A. OVERVIEW OF THE ’780 AND ’094 PATENTS ........................................ 3

B. “(G) RECEIVING THE SYMMETRIC KEY” (’780 PATENT, CL ........................................ 6

1. THE INTRINSIC RECORD CONSISTENTLY IDENTIFIES MNO-CONTROLLED KEY RELEASE AS CENTRAL TO THE INVENTION ........................................ 6

2. NETWORK-1’S CONSTRUCTION WOULD RECREATE THE VERY SECURITY VULNERABILITY THE PATENTS SOUGHT TO ADDRESS ........................................ 9

3. THE CLAIM LANGUAGE AND INTRINSIC RECORD SUPPORT CONSTRUING THE SOURCE OF THE SYMMETRIC KEY ........................................ 11

4. THE SPECIFICATION NEVER DESCRIBES THE SUBSCRIPTION MANAGER DELIVERING THE SYMMETRIC KEY ........................................ 11

5. SAMSUNG’S IPR ARGUMENTS ARE NOT INCONSISTENT AND DO NOT SUPPORT NETWORK-1’S PROPOSED CONSTRUCTION ........................................ 13

6. NETWORK-1’S EXTRINSIC EVIDENCE DOES NOT SUPPORT ITS CONSTRUCTION ........................................ 14

IV. THE DISPUTED TERMS OF THE ’869 PATENT ........................................ 15

A. OVERVIEW OF THE ’869 PATENT ........................................ 15

B. “CRYPTOGRAPHIC PARAMETERS” (’869 PATENT, CLAIMS 1, 4, 18) ........................................ 16

1. THE SPECIFICATION CONSISTENTLY DESCRIBES “CRYPTOGRAPHIC PARAMETERS” AS INPUTS INTO, AND SETTINGS FOR, CRYPTOGRAPHIC ALGORITHMS ........................................ 17

2. THE CLAIMS DISTINGUISH “CRYPTOGRAPHIC PARAMETERS” FROM “KEYS” ........................................ 24

3. THE DEPENDENT CLAIMS ARE CONSISTENT WITH SAMSUNG’S CONSTRUCTION ........................................ 25

4. THE PROSECUTION HISTORY OF THE INCORPORATED ’401 APPLICATION CONFIRMS THAT PARAMETERS ARE DISTINCT FROM KEYS ........................................ 26

## TABLE OF CONTENTS

**Page**


5. THE ’780 PATENT SUPPORTS SAMSUNG’S CONSTRUCTION AND DISTINGUISHES “PARAMETERS” FROM “KEYS” ........ 27

6. THE EXTRINSIC EVIDENCE CORROBORATES SAMSUNG’S CONSTRUCTION ........ 28

7. SAMSUNG’S IPR POSITION IS CONSISTENT WITH ITS CONSTRUCTION HERE ........ 29

V. CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abbott Diabetes Care, Inc.*,
696 F.3d 1142 (Fed. Cir. 2012)....................7

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*,
265 F.3d 1294 (Fed. Cir. 2001)....................27

*Becton, Dickinson & Co. v. Tyco Healthcare Grp. LP*,
616 F.3d 1249 (Fed. Cir. 2010)....................24

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
558 F.3d 1368 (Fed. Cir. 2009)....................18, 23

*Intellectual Ventures II LLC v. FedEx Corp.*,
No. 2:16-CV-00980-JRG, 2017 WL 5896180 (E.D. Tex. Nov. 29, 2017)....................11

*Nystrom v. TREX Co.*,
424 F.3d 1136 (Fed. Cir. 2005)....................18

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)....................17

*Openwave Sys., Inc. v. Apple Inc.*,
808 F.3d 509 (Fed. Cir. 2015)....................10, 11

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)....................17

*PSN Ill., LLC v. Ivoclar Vivadent, Inc.*,
525 F.3d 1159 (Fed. Cir. 2008)....................12

*Regeneron Pharms., Inc. v. Mylan Pharmaceuticals, Inc.*,
130 F.4th 1372 (Fed. Cir. 2025) ....................24

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001)....................7

*Techtronic Indus. Co. v. ITC*,
944 F.3d 901 (Fed. Cir. 2019)....................7

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
529 F.3d 1364 (Fed. Cir. 2008)....................12

*Trs. of Columbia Univ. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016)....................14

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
200 F.3d 795 (Fed. Cir. 1999)....................29

**Statutes**

35 U.S.C. § 112(d)....................25

# I. INTRODUCTION

The asserted patents trace their priorities back to applications filed in 2013, when the technical details of eSIM standards remained unsettled. Their claims, however, were drafted in continuation applications filed years later, after the relevant eSIM standards had taken shape. And now arguing "plain and ordinary meaning," Network-1 seeks to ignore the inventions actually disclosed in the patents and stretch those claims to reach the eSIM standards ultimately adopted.

Network-1's proposed construction of "receiving the symmetric key" disregards the very problem the '780 and '094 Patents purport to solve. The patents' shared specification anticipated a security concern with the emerging eSIM provisioning framework: allowing third parties to distribute the network-access keys required to access the network of the mobile network operator ("MNO") could compromise the security of that network. The patents' solution was to preserve the MNO's control over its network-access keys; while a subscription manager could deliver encrypted MNO network-access keys, the MNO would control their use by releasing the symmetric key required to decrypt them. The MNO's control over the network-access keys is thus a fundamental aspect of the invention. Network-1 nevertheless seeks to encompass a subscription manager delivering both the encrypted network-access key and the symmetric key needed to decrypt it, eliminating the defining feature of the disclosed invention.

As to "cryptographic parameters," the '869 Patent claims, specification, and prosecution history uniformly use the term to mean input settings for cryptographic algorithms—distinct from the keys those algorithms consume or produce. Network-1 offers no competing construction, urging only "plain and ordinary meaning," while arguing that keys, which claim 1 recites as separate elements, fall within its unstated construction. Network-1's argument mischaracterizes the specification, Samsung's construction, and the declaration of Samsung's expert.

The Court should reject Network-1's "plain and ordinary meaning" constructions and adopt

Samsung's, which reflect a POSITA's understanding of the terms, as used in the patents.

## II. BACKGROUND: ESIM TECHNOLOGY

To access a cellular network operated by a mobile network operator ("MNO"), a mobile device must authenticate with the network using network-access credentials. These credentials include a subscriber identity (such as an International Mobile Subscriber Identity or "IMSI") and a secret network-access key K. Traditionally, network-access credentials were stored on a physical subscriber identity module ("SIM") card inserted into the device. Because those cards had to be physically installed, changing MNOs generally required replacing the SIM card.

In 2013, when the patents' priority application was filed, industry standards were being developed for embedded SIM ("eSIM") technology, to allow devices to obtain network credentials remotely without replacing a physical SIM card. Those credentials would be delivered over the air as part of an eSIM profile. The contemplated architecture introduced a subscription manager ("SM") to handle the distribution of eSIM profiles (including network-access key K), allowing devices to be provisioned remotely without the MNO having to manage the delivery of profiles to the individual devices themselves. As illustrated below, the architecture involved three principal components: (1) an MNO, which operates the cellular network and supplies network credentials, including network-access key K; (2) an SM, which distributes eSIM profiles containing those credentials; and (3) an embedded universal integrated circuit card ("eUICC") in the device, which receives the eSIM profile, and uses network-access key K to access the MNO's cellular network.



As the patents acknowledge, this basic eSIM architecture had been contemplated well before the patents' priority date. *See* '780 Patent, 3:13-30. However, the eSIM standards were still in development, and many of the technical details governing how profiles and network credentials would be generated, secured, and delivered had not yet been finalized. *Id.*

## III. <u>THE DISPUTED TERMS OF THE '780 AND '094 PATENTS</u>

### A. Overview of the '780 and '094 Patents

The '780 and '094 Patents share a common specification and both claim priority to an application filed on December 6, 2013, but the '780 Patent issued from a continuation filed on June 26, 2019, and the '094 Patent from a continuation filed on January 18, 2024.

The patents identify a potential problem with the developing eSIM (eUICC) provisioning architecture, in which a subscription manager distributes the MNO's network-access key K required to access the MNO's network. Ex. B, '780 Patent, 2:65-3:17, 3:61-64. As the specification explains, because the MNO may not control the distribution or release of network-access key K by the subscription manager, the security of that key (and thus access to the MNO's network) is no stronger than the security used by the subscription manager to transfer key K. *Id.*, 3:56-4:10.

As an analogy, consider an individual seeking to send valuables via a courier service. Once those valuables leave the sender's hands, their safety depends on the courier, and inadequate protection can put them at risk. Similarly, the patents explain that conventional eUICC provisioning could permit fraudulent users or impostors to obtain network credentials and access the MNO's network. *Id.*, 35:35-46.



The patents propose a solution to this security risk: give the MNO its own lock on its network-access key K. The MNO can still rely on the SM to assemble and deliver the profiles. But the network-access key K inside each profile is separately encrypted with a symmetric key that the MNO controls, as illustrated in excerpted Figure 2a, to the right. '780 Patent, Fig. 2a, 29:47-30:8, 41:4-10.




The resulting provisioning process is illustrated in Figure 3 of the patents (*see, e.g.*, Ex. A, Rangan Decl. ¶ 60), and a simplified diagram emphasizing the relevant steps is shown below:




The SM receives profile data (including the network-access key K) from the MNO, with network-access key K already encrypted by the MNO's symmetric key (step 1). The subscription manager then delivers the profile to the device (step 2). The device authenticates with the MNO and receives the symmetric key from the MNO in response (step 3). The device then uses the symmetric key to unlock the MNO's network-access key K (step 4), and uses network-access key K to access the MNO's cellular network (step 5). The MNO thus "can retain control" over its network-access key K, "not releasing the symmetric key until after a user has successfully completed authentication

with the mobile network operator." *Id.*, 6:42-49. Until the MNO releases the symmetric key, no entity, including "an eUICC subscription manager 109," can read the locked network-access key K. *Id.*, 59:62-67.

In terms of the courier analogy, the sender now locks the valuables in a safe before handing them over to the courier for shipping. Neither the courier nor a thief stealing the safe is able to open the safe and access the valuables because they do not have the combination. After receiving the safe, the recipient has to contact the sender directly to retrieve the combination and the sender gives the combination only to the intended recipient, after confirming the recipient's identity. In this manner, the sender has direct control over who is able to access the valuables.




The specification's roughly 80 columns describe a variety of different embodiments, some covered by the asserted claims and some not, but in all cases, the MNO (not the subscription manager) controls access to the network-access key K. For instance, in one embodiment, the symmetric key (which is used to decrypt the network-access key K) is not "received" from any entity, but is instead derived by the device and ***the MNO*** through a key exchange. '780 Patent, 41:61-66; Ex. A, Rangan Decl. ¶65. In another embodiment, there is no need for a symmetric key at all because network-access key K is itself mutually derived by the eUICC and ***the MNO*** rather than delivered as part of a profile. '780 Patent, 71:46-56; Rangan Decl. ¶68; *see also id.* ¶69. And, where the specification describes a symmetric key being delivered (as in the asserted claims), it is always delivered ***by the MNO***. The specification describes no embodiment in which the SM

supplies the symmetric key. Rangan Decl. ¶¶59-71.

**B. "(g) receiving the symmetric key" ('780 Patent, Cl. 1; '094 Patent, Cl. 1)**

| Samsung's Proposed Construction | Network-1's Proposed Construction |
|---|---|
| "(g) receiving the symmetric key from a source other than the subscription manager" | Plain and ordinary meaning |

Claim 1 distinguishes between "receiving ***from the subscription manager system***, an encrypted profile" in limitation 1(f) and "receiving the symmetric key" in limitation 1(g). Consistent with this distinction and the core inventive concept of the patent – allowing the MNO to maintain control over network access credentials – Samsung's construction makes explicit the requirement that the symmetric key is received from a source other than the subscription manager.

Network-1 seeks to disregard the patents' actual invention and expand the claims to cover a configuration the inventor never contemplated. Network-1 argues that, because limitation 1(g) does not expressly identify a sender, the symmetric key may be received from the subscription manager. Under Network-1's proposed "plain and ordinary meaning," the subscription manager could thus have access to and deliver both the encrypted network-access key K and the symmetric key needed to decrypt it—giving the subscription manager full control over the release of the MNO's credentials. But that is precisely the security vulnerability the patents sought to address.

**1. The Intrinsic Record Consistently Identifies MNO-Controlled Key Release As Central to the Invention**

Only Samsung's construction gives effect to the solution to the security problem the patents set out to address: although a subscription manager may distribute an MNO's encrypted network-access credentials (including network-access key K), the MNO retains control over their release.

The Federal Circuit has repeatedly construed claims to preserve the feature a patent identifies as its solution to a problem in the prior art, even where the claims do not expressly recite

that feature. In *Techtronic Industries*, for example, the claims recited a "wall console" without expressly reciting a motion detector in the console. *Techtronic Indus. Co. v. ITC*, 944 F.3d 901, 907-09 (Fed. Cir. 2019). The Federal Circuit nevertheless imposed that requirement on the claims, because the specification consistently identified moving the detector from the garage-door opener's head unit to the wall console as the solution to problems with conventional designs. *Id.*

Similarly, in *SciMed Life,* the asserted patents criticized conventional catheters with side-by-side lumens and described a coaxial arrangement as the invention's improvement. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341-44 (Fed. Cir. 2001). Although the claims did not expressly require coaxial lumens, the Federal Circuit rejected a construction encompassing the side-by-side arrangement because the specification consistently distinguished it from the invention. *Id.* at 1342-44; *see also In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142, 1148-50 (Fed. Cir. 2012) (excluding external cables from the construction of "electrochemical sensor," notwithstanding the absence of an express disclaimer, because the specification consistently depicted cable-free sensors as overcoming deficiencies of the prior art).

The same principle applies here. The '780 and '094 Patents expressly identify the security vulnerability created when a subscription manager is used for eSIM provisioning. The patents explain that, in such situations, the MNO "may not control the distribution or release of profiles" from the subscription manager. '780 Patent, 3:56-61. And when those profiles contain network-access credentials (e.g., key K), the security of those credentials is dependent on the security of the transmission by the subscription manager—which may be outside the MNO's control. *Id.*, 4:1-10. As a result, the patents explain that conventional eUICC provisioning could permit fraudulent users or impostors to obtain network credentials and access the MNO's network. *Id.*, 35:35-46.

The specification then identifies precisely what is needed to address that vulnerability: "[a]

need exists in the art" to secure network-access key K "without depending on physical distribution of the key K or electronic distribution of the key K through 3rd parties, even in encrypted form." '780 Patent, 3:51-56. It further identifies the need for decryption of network-access key K to remain "***under the control of the mobile network operator***." *Id.*, 3:56-61. And it concludes by expressly stating "[t]herefore, a need exists in the art ***for the MNO*** to securely and efficiently control the use of an electronically transferred key K… even though copying and distributing the profile may be outside the control of the MNO." *Id.*, 4:11-15. These are not descriptions of a particular embodiment. These are the problems the specification identifies as requiring a solution.

The Summary confirms that preserving MNO control is central to that solution. It describes "[t]he methods and systems contemplated herein" solve the identified problems by using an eUICC that supports both authentication of the user by the MNO and "the secure decryption or derivation of the key K ***under control of the MNO***." *Id.*, 4:53-67. The distinction is deliberate: another entity may distribute the encrypted credentials, but the MNO controls whether the protected network-access key K can be decrypted and used. And again, this is not a description of a particular embodiment; this is the general solution proposed by the patents and common to all embodiments.

The Summary then describes various embodiments for providing the MNO with control over the network-access key K, including through the use of a symmetric key to encrypt the network-access key K. *Id.*, 5:6-8:40. For example, the Summary describes the MNO (***not*** the subscription manager) authenticating the user and only then sending the symmetric key needed to decrypt the protected network-access key K. *Id.*, 6:18-41. That matters because, without the symmetric key, decryption of the protected network-access key K "is not feasible," allowing the MNO to "retain control over the use of the [network-access] key K" until the user has been authenticated by the MNO. *Id.*, 6:42-49. Thus, the source of the symmetric key is directly tied to

the security improvement the patents purport to provide.

The detailed description makes the same point while contrasting the disclosed approach with conventional technology. It explains that conventional eUICC provisioning may permit fraudulent users to obtain network credentials and access the MNO's network. *Id.*, 35:35-46. The invention addresses that problem by disclosing two network-access credentials: a "first key K" that provides limited access to the MNO's cellular network to enable the device to authenticate itself with the MNO, and a "second key K" (the network-access key K) providing full network access, which is encrypted with a symmetric key ***that the MNO*** releases following authentication. *Id.*, 35:19-52. The specification explains that this arrangement keeps decryption of the protected network-access key K (the "second key K" in this embodiment) under MNO control and increases security over conventional technology. *Id.*, 35:25-39. Indeed, it expressly distinguishes the "first key K," access to which may be outside the MNO's control, from the protected "second key K," over which the MNO maintains access control. *Id.*, 35:46-52. In particular, it permits the MNO to retain control over the release of the network-access key K even though it may not control the channel used to distribute it. It is thus no coincidence that every disclosed instance of delivering symmetric key 127 to the device identifies the MNO—not the subscription manager—as the sender; this is core to the invention. *See id.*, 6:27-29, 41:48-54, 59:34-40.

### 2. Network-1's Construction Would Recreate the Very Security Vulnerability the Patents Sought to Address

Network-1's proposed construction would enable precisely the arrangement the patents identify as a security risk. Under Network-1's proposal, a subscription manager could control and provide to a user both the encrypted network-access key K and the symmetric key needed to decrypt it. The MNO would, therefore, rely on the subscription manager to distribute its network-access key K and control its release. That is the very dependence the invention sought to eliminate.

As explained above, the invention in the specification is analogous to placing valuables in a locked safe before handing them over to a courier for shipment. The courier transports the safe, but only the sender can authorize its opening by providing the code to the intended recipient, which the sender does independent of the courier. Similarly, the subscription manager delivers the encrypted network-access key K, but only the MNO provides the intended recipient the symmetric key needed to decrypt it. *Id.*, 6:27-49, 59:34-40. As illustrated below, giving the courier both the safe and its combination code would eliminate the protection achieved by putting the valuables in the safe. But Network-1's construction does exactly that: it permits the subscription manager to control and deliver both the protected network-access key K and the means to unlock it.



**The Patents' Solution to the Security Threat**



**The Security Threat Network-1's Construction Leaves Unaddressed**

Network-1 cannot invoke "plain and ordinary meaning" to encompass that which is distinguished by the patents and that eliminates the very solution they actually propose. As the Federal Circuit explained in *Openwave Systems*, a patentee cannot invoke the ordinary meaning of its claims to encompass an architecture the specification repeatedly criticizes and distinguishes from the invention. *Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513-17 (Fed. Cir. 2015). There, the court construed "mobile device" as "a portable wireless two-way communication device that does not contain a computer module," because the specification consistently criticized

communication devices that included computer modules and explained the benefits of the disclosed alternative. *Id.* The same reasoning applies here.

**3. The Claim Language and Intrinsic Record Support Construing the Source of the Symmetric Key**

Network-1 argues that the patentee knew how to specify the source of information where it intended to do so because limitation 1(f) expressly recites a source while limitation 1(g) does not. Op. Br. at 6. But that argument treats the absence of an express source limitation as dispositive, without considering what the specification discloses, something this Court has specifically rejected. In *Intellectual Ventures II LLC v. FedEx Corp.*, the claims recited "verifying field crew identity" without expressly identifying the entity performing the verification. No. 2:16-CV-00980-JRG, 2017 WL 5896180, at *14-16 (E.D. Tex. Nov. 29, 2017). The patentee, like Network-1 here, proposed "plain and ordinary meaning" and argued that requiring verification by the enterprise computing system would improperly import a limitation from the specification. *Id*. This Court disagreed. Because the specification consistently described the enterprise computing system as performing the verification, the Court construed the term to require "verifying, by the enterprise computing system, the identity of the field crew." *Id*.

This same logic applies equally here. Although limitation 1(g) does not explicitly recite the source of the symmetric key, when a symmetric key is sent, the specification consistently identifies the MNO, not the subscription manager, as the source. In this manner, the MNO controls release of the network-access credentials, as contemplated by the invention. *See, e.g.*, '780 Patent, 6:27-49, 35:19-52, 41:48-54, 59:34-40. As in *Intellectual Ventures*, identifying the source of the disputed step gives effect to the alleged security improvement described in the intrinsic record.

**4. The Specification Never Describes the Subscription Manager Delivering the Symmetric Key**

Network-1 argues that Samsung's construction excludes disclosed embodiments based on

two isolated statements within the 80-column specification: that the MNO "***could operate*** the eUICC subscription manager" and "could also ***function as*** a eUICC subscription manager." '780 Patent, 11:30-38, 37:40-43; Op. Br. at 7. This argument fails on the law and the facts.

***First***, it is well settled that the claims of a patent need not encompass every embodiment disclosed in the specification. *See TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) (declining to construe claim term to cover alternative embodiment); *PSN Ill., LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1166 (Fed. Cir. 2008) ("Oatey is not a panacea, requiring all claims to cover all embodiments"). Indeed, it is for precisely this reason that there are so many different patents issuing out of the same parent application. *See* Ex. M.

***Second***, Network-1 ***infers*** from the disclosure of embodiments where the MNO operates, or functions as, the subscription manager, that the subscription manager may deliver the symmetric key. But, as Dr. Rangan explains, a POSITA would understand that the MNO-operated subscription-manager embodiments correspond to unclaimed alternatives in which no symmetric key is received because it is not needed. Rangan Decl. ¶¶67-71. The purpose of the symmetric-key mechanism is to preserve the MNO's control over its network-access key K when an independent subscription manager distributes the encrypted profile over a channel outside the MNO's control. *Id.* ¶¶70, 73-75. Where the MNO itself operates or functions as the subscription manager, the MNO already controls that distribution, eliminating the need for a separate symmetric-key mechanism. *Id.* ¶70. Consistent with that understanding, the specification describes alternatives in which the MNO retains control without transmitting a symmetric key. In one alternative, the MNO withholds the network-access key K until after the user authenticates, then releases it encrypted with the eUICC's public key, which the eUICC can decrypt using its private key. '780 Patent, 51:37-63; Rangan Decl. ¶69. In others, the MNO and device derive the symmetric key rather than transmit

it, or mutually derive the network-access key K, eliminating the need for the symmetric key. '780 Patent, 41:61-66, 71:46-56, 74:24-31; Rangan Decl. ¶¶65, 68. Thus, where the specification describes delivery of the symmetric key, the MNO delivers it; where the MNO controls network access by other means, no symmetric key need be received. Rangan Decl. ¶¶59, 67-71. The latter are unclaimed alternatives, and the claims need not encompass every disclosed embodiment.

***Third***, even if Network-1 were correct that the MNO-operated subscription-manager embodiments involve receipt of the symmetric key—something the specification never describes—Network-1's argument would still fail because, critically, the specification never describes the subscription manager delivering symmetric key of the claims (symmetric key 127) in ***any*** embodiment. Whenever the specification describes transmitting that key, it identifies the MNO as the sender. *See* '780 Patent, 6:27-49, 41:48-54, 59:34-40; Rangan Decl. ¶¶59-71. Further, the specification expressly distinguishes the MNO-controlled transmission of the symmetric key from the delivery of the encrypted network-access key K over a channel the MNO may not control. '780 Patent, 59:52-60:5. Network-1 identifies no contrary disclosure.

#### 5. Samsung's IPR Arguments Are Not Inconsistent And Do Not Support Network-1's Proposed Construction

Network-1 takes Samsung's IPR arguments out of context, asserting that Samsung agreed the claims place no limitation on the source of the symmetric key. Op. Br. at 8-9. But Samsung's petitions made precisely the opposite point: the specification consistently identifies the MNO as the source of the symmetric key to preserve the MNO's control over its network-access key K, whereas Network-1 interprets the claims to encompass receipt of the symmetric key from the subscription manager. *See, e.g.*, Ex. K ('780 IPR Petition) at 9-10. Samsung explained that, although the claims do not expressly identify the source of the symmetric key, the specification provides no written-description support for Network-1's broader reading. *Id.* Samsung therefore

challenged the patents' asserted priority dates on that basis.

Samsung's obviousness grounds addressed the claims under Network-1's broader interpretation, ***but did not endorse it***. To the contrary, the petitions expressly "reserve[d] all rights to raise claim construction and other arguments in district court." *Id.* at 11, n.4. Samsung's position has thus been consistent throughout: the specification does not support Network-1's interpretation, and the claims are obvious if construed to encompass that unsupported scope.

The PTAB's institution denials do not establish otherwise. Because every IPR ground relied on the subscription manager delivering the symmetric key—consistent with Network-1's construction, but excluded under Samsung's—none would have satisfied limitation 1(g) if the Board agreed with Samsung's understanding of the claims. The denials, which were made without explanation, are thus equally consistent with Samsung's district court construction being adopted and provide no basis to infer that the Board adopted Network-1's broader interpretation.

**6. Network-1's Extrinsic Evidence Does Not Support Its Construction**

Finally, Network-1's extrinsic evidence does not address the dispute. Network-1 cites a lay dictionary definition of "receive" and a general description of "symmetric keys." Op. Br. at 10. But the parties do not dispute what it means to receive something or what a symmetric key does. They dispute whether the claimed symmetric key may be received from the same subscription manager that delivers the encrypted profile. Neither source addresses that question. That is why the intrinsic evidence matters. As the Federal Circuit explained in *Columbia University*, the ordinary meaning relevant to claim construction is the meaning in the context of the patent, not a dictionary definition considered in isolation. *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363-64 (Fed. Cir. 2016). And the parties' disagreement cannot be resolved merely by directing the jury to apply "plain and ordinary meaning."

Here, the specifications consistently distinguish the subscription manager's delivery of the

encrypted profile from the MNO's controlled release of the symmetric key needed to unlock its protected credentials. Network-1's construction would eliminate that distinction and nullify the security improvement said to be provided by the patents.

## IV. THE DISPUTED TERMS OF THE '869 PATENT

### A. Overview of the '869 Patent

The '869 Patent claims priority to an application filed on November 19, 2013, but issued from a continuation filed ten years later, on August 3, 2023. '869 Patent, cover.

Like the '780 and '094 Patents, the '869 Patent concerns eSIM technology, but it focuses on how a device derives the keys it uses to communicate with the wireless network. '869 Patent, Abstract. It describes a wireless module (e.g., smartphone) that stores keys and a module identity (such as an international mobile subscriber identity ("IMSI")), along with a "set of cryptographic algorithms 141" used to derive keys, encrypt and decrypt data, and process digital signatures. *Id.*, 2:21-22, 25:20-23, 26:23-28, 28:5-12, Fig. 1c; Rangan Decl. ¶¶36-40. Separately, the specification describes a "set of cryptographic parameters 126" that configures those algorithms—for example, by "specifying key lengths, elliptic curves to utilize (if ECC), modulus (if RSA) or other parameters or settings required." '869 Patent, 31:7-11.

Claim 1 recites a method in which a mobile device securely receives an encrypted eUICC profile and decrypts it ("provisioning" steps (a)-(d)), and then takes steps to send encrypted data to a network server ("authentication" steps (e)-(i)). Rangan Decl. ¶41. As shown in the illustrations to the right, in limitation 1(b), a mobile device receives from a



first server (e.g., wireless network) an encrypted profile containing three distinct items: "cryptographic parameters, a module identity, and a key K". '869 Patent, cl. 1; Rangan Decl. ¶42. In limitation 1(g), the cryptographic parameters and the device's private key are used in a cryptographic algorithm to generate a symmetric key. '869 Patent, cl. 1; Rangan Decl. ¶43. Throughout, the claim names each key separately and recites the "cryptographic parameters" as a distinct item received and used with them. '869 Patent, cl. 1.

**B. "cryptographic parameters" ('869 Patent, Claims 1, 4, 18)**

| Samsung's Proposed Construction | Network-1's Proposed Construction |
|---|---|
| "input settings for cryptographic algorithms" | Plain and ordinary meaning |

Samsung proposes a construction of "cryptographic parameters," consistent with the use of the term throughout the specification and claims, and supported by the ordinary meaning, to be "input settings for cryptographic algorithms," as distinct from cryptographic keys.

In contrast, Network-1, hiding behind "plain and ordinary meaning," seeks to expand the term far beyond its ordinary meaning and what is described in the patent. Network-1 does not say what the "plain meaning" is; it says only that the term is not limited to "input settings" and may include cryptographic keys. Op. Br. at 2, 10-11, 18-21; Sundaresan Decl. ¶¶55, 58, 66.

Notably, Network-1's own discovery conduct undermines its position. In its Rule 45 subpoenas seeking technical information from mobile network operators, Network-1 did not rely on plain meaning; it gave an express definition: "'Cryptographic Parameters' means any parameters or configurations used by or for Cryptographic Algorithms." Ex. H (AT&T Subpoena) ¶22; Ex. I (T-Mobile Subpoena) ¶22; Ex. J (Verizon Subpoena) ¶22. While Samsung does not propose this definition, it certainly demonstrates the need for one here; if Network-1 believed a definition was required for the network operators (who are well-versed in the technical jargon of

cellular standards), then certainly a lay jury should be told what the term means here.

There is, therefore, an unavoidable dispute as to the term's boundary which requires resolution by the Court. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361-62 (Fed. Cir. 2008).

### 1. The Specification Consistently Describes "Cryptographic Parameters" as Inputs Into, and Settings For, Cryptographic Algorithms

Samsung's construction of "cryptographic parameters" as "input settings for cryptographic algorithms" is driven by the intrinsic evidence. That the specification does not explicitly use the two-word phrase "input settings" (Op. Br. at 10, 13) is beside the point; the question is what a POSITA would understand the claimed term to mean. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-14 (Fed. Cir. 2005).

***Cryptographic parameters are "input into" algorithms.*** The specification describes a "set of cryptographic algorithms 141" and then describes the "set of cryptographic parameters 126" by reference to each of those algorithms in turn. Rangan Decl. ¶81 (citing '869 Patent, 30:47-62). In each instance, the parameters are what is "input into" the algorithm:

| **Algorithm** | **'869 Patent Description** |
|---|---|
| Asymmetric ciphering | "[C]ryptographic parameters 126 can include ***input into*** asymmetric ciphering algorithms 141a, such as, but not limited to, specifying key lengths, elliptic curves to utilize (if ECC), modulus (if RSA) or other parameters or settings." 31:7-11. |
| Symmetric ciphering | "Cryptographic parameters 126 ***input into*** symmetric ciphering algorithms 141b can include symmetric key 127 length, such as, but not limited to, the selection of 128, 192, or 256 bits with AES 155 symmetric ciphering, and cryptographic parameters 126 could also select a symmetric ciphering algorithm…." 32:1-7. |
| Secure hash | "Cryptographic parameters 126 ***input into*** secure hash algorithms 141c can include the selection of the length of the secure hash, such as, but not limited to, using 224, 256, or 512 bits with either SHA-2 or SHA-3." 32:26-30. |
| Digital signature | "Cryptographic parameters 126 ***input into*** digital signature algorithms 141d can include the selection of a secure hash algorithms 141c to utilize with digital signature algorithms 141d, or the algorithm to utilize...." 32:52-60. |

| **Algorithm** | **‘869 Patent Description** |
|---|---|
| Key pair generation | "Cryptographic parameters 126 ***input into*** key pair generation algorithms 141e can include the type of asymmetric ciphering algorithms 141a used with the keys, the key length in bits, an elliptic curve utilized for ECC, a time-to-live for a public key that is derived, and similar settings." 33:65-34:2. |

Ex. D, '869 Patent; Rangan Decl. ¶¶81-83. The specification never describes an algorithm producing or outputting "cryptographic parameters": they are inputs. Rangan Decl. ¶83.

***Cryptographic parameters are "settings."*** When the specification describes the parameters generically, it calls them "settings": "***[p]arameters 126*** may comprise ***settings*** for a cryptographic algorithms 141 as illustrated in FIG. 1i and FIG. 1d." '869 Patent, 76:31-45, 97:38-52 (same); Rangan Decl. ¶84. And every example of a "cryptographic parameter" in the specification is a configuration value—e.g., a cipher or hash selection, a key or hash length, a padding scheme, an elliptic curve, or a time-to-live—***not a key*** value. Even where a parameter *concerns* a key (e.g., its length or validity period), the specification never characterizes the key value itself as a parameter. Rangan Decl. ¶85 (citing '869 Patent, 32:1-7, 32:26-30, 32:52-60, 33:65-34:2, 34:2-12, 76:31-45). The specification states the relationship directly: "[t]he module can utilize the set of cryptographic algorithms and the set of cryptographic parameters to securely generate or derive module private keys and module public keys." '869 Patent, 5:23-26. Where, as here, the specification "repeatedly and uniformly" describes a claim element in a particular way, the claims should be construed accordingly. *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374-75 (Fed. Cir. 2009); *see also Nystrom v. TREX Co.*, 424 F.3d 1136, 1144-46 (Fed. Cir. 2005).

***Figure 1i confirms Samsung's construction.*** Figure 1i (below) depicts a "Set of Cryptographic Parameters 126" (corresponding to the claimed "cryptographic parameters") as configuration fields listing available options, alongside a "Subset of Cryptographic Parameters 126a" that narrows each field to a chosen value. '869 Patent, Fig. 1i; Rangan Decl. ¶87. The nodes

thereby "select and agree on a subset of cryptographic parameters 126a for use with a set of cryptographic algorithms 141." '869 Patent, 43:1-4; Rangan Decl. ¶88. And notably, none of the cryptographic parameters are keys. *Id.*




***Network-1's alleged counterexamples hinge on a strawman mischaracterization of Samsung's construction.*** Network-1 argues that Figure 1i and other passages show examples of "cryptographic parameters" that are "settings but not inputs" or "inputs but not settings." Op. Br. at 15-18. But this argument relies on a strawman reading of Samsung's "input settings" construction as "the intersection of two concepts (inputs and settings)" that "requires every parameter to be both an input and a setting," and where (according to Network-1's incorrect reading) an "input" means a number the algorithm operates on, and "setting" means a choice among options. *See id.*, 13-15; *see also id.* 12, 17 (arguing *G* is a number, and thus not a "setting"), 17 (arguing equation values fed into the algorithm are not selections among options, and thus not

settings). This argument fails for multiple reasons.

Contrary to Network-1's misreading, "input" does not describe a second, independent category or "value-type," different from "settings." And nowhere does Samsung or its expert propose that the words "input" and "setting," either alone or in combination, be understood as narrowly as Network-1 describes. "Input settings" is a single category. "Input" describes the role the "settings" play—they are supplied to cryptographic algorithms. *See* Rangan Decl. ¶86; '869 Patent, 31:7-11, 33:65-34:2. And "settings" are configuration values for the cryptographic algorithm, which Samsung's construction does not limit to a "value-type." The patent describes "cryptographic parameters 126 could include either strings or numbers," and lists numeric values and selections together, as parameters "input into" algorithms, "specifying key lengths, elliptic curves to utilize (if ECC), modulus (if RSA)." '869 Patent, 31:7-11, 34:40-44; Rangan Decl. ¶86.

Network-1's assertion that "input" does "no work" except to exclude keys is also wrong. Op. Br. at 15. Limitation 1(g) recites "parameters" as an input, along with the separately-recited private key, to the cryptographic algorithm (an ECDH key exchange), with the symmetric key as the output. '869 Patent, cl. 1. That is not an "unstated" exclusion, but the line the claim itself draws.

Turning to Network-1's asserted counterexamples, none support its position. Network-1 argues entries such as a key-pair validity window of "365 days," a "Mandatory" security token, and "Certificate Required: No" are "settings but ***not inputs***." Op. Br. at 15-17. The first example is simply wrong; the specification expressly identifies a key's validity period as a parameter "***input*** into key pair generation algorithms 141e"—"a time-to-live for a public key that is derived." '869 Patent, 33:65-34:2. The other two examples depend on Network-1's mischaracterization of the construction; as explained above, an "input" describes the role the settings play: they are ***supplied to*** an algorithm before it runs, as opposed to the algorithm's outputs. Whether a token is mandatory

and whether a certificate is required are both agreed on in advance and supplied to the algorithms; the nodes "select and agree on" them "for use with a set of cryptographic algorithms 141." *Id.*, 43:1-4, Fig. 1i. They are thus ***input*** **settings** for the algorithm.

Network-1's other "settings but not inputs" are drawn mostly from the "general parameters 126b" and similarly fail. Op. Br. at 17; Sundaresan Decl. ¶¶63-66. General parameters 126b are "values that can be utilized in a set of cryptographic algorithms 141"—*i.e.*, they are ***input*** to the algorithms. '869 Patent, 44:28-30. The "method of authentication for a derived module public key," for example, *selects* which cryptographic operation the module runs to authenticate its derived public key. *Id.*, 44:54-62. That is an ***input*** in the same vein as the selections that are explicitly described as "input into" algorithms. *Id.*, 32:52-60; *see also id.*, 32:1-7 (parameters "input into" symmetric ciphering algorithms "could also select a symmetric ciphering algorithm").

Network-1's "inputs but ***not settings***" examples are based on the mirror-image error. For instance, Network-1 argues that the "Equation Values: p, a, b, g, n" are "inputs but not settings." Op. Br. at 15-17. This depends on Network-1's overly narrow and incorrect reading of "setting" as meaning only a choice among options, and excluding numeric values such as those cited. But those values are, as Network-1 concedes, "the numbers that define the elliptic curve itself" (Op. Br. at 17)—*i.e.*, the ***setting*** according to which the curve arithmetic is performed, whether the curve is specified by those values or by name (e.g., "sect239k1"). Ex. F, SEC-1 §§ 3.1, 3.1.1; Rangan Decl. ¶¶102-103; '869 Patent, 34:28-39.

The same is true for Network-1's additional "inputs but not settings" examples. Op. Br. at 17-18. "[B]ase point G," and "the Diffie-Hellman values p and g," for example, ***are settings*** that set the environment for the key exchange: they define, in advance, the mathematical group in which every computation takes place. '869 Patent, 33:47-56, 141:25-30; Rangan Decl. ¶103.

Likewise, the random-number-generator examples specify "the use of a seed 128b, or a module seed file, or the minimum length of a random number 128a" are all ***settings*** for how the generator operates. *Id.*, 45:60-64. And, as discussed in the following paragraph, the algorithm token 190 is never described as a "cryptographic parameter" when it is used as a key.

***The specification does not classify a cipher key as a cryptographic parameter.*** Grasping at support for its strained "plain and ordinary meaning" as including "keys," Network-1 argues that "'algorithm token 190' (which can be a key) is a cryptographic parameter." Op. Br. at 19-21. That argument conflates two different uses of the token in two distinct contexts: one in which the token functions as a ***key, not a parameter***; and another, in which the token functions as a ***parameter, not a key***. As understood by a POSITA, a "token" is a unit of data, the contents of which depends on the context in which it is used. The '869 Patent itself mentions "token" about 240 times; token 190, which alone appears about 75 times, is described as a temporary value—such as a timestamp, a random number, or both—whose role depends on the algorithm using it. *See* '869 Patent, 36:55-57, Fig. 1f. It is described as a "key" or "cipher key" ***only for the secret ciphering algorithm 141h***, which encrypts a module identity. *Id.*, 35:5-9, 38:53-63, Fig. 1g. Importantly, when token 190 functions as a key in that algorithm 141h context, it is never referred to as a "parameter" or "cryptographic parameter."

The passages cited by Network-1 that place the token in a subset of the "parameters"—over 100 columns later in the specification—concern a different algorithm, ***shared secret algorithm 141g***. *Id.*, 142:21-24, 146:29-34. In that role, algorithm 141g accepts "(i) a set of component parameters 101t and (ii) an algorithm token 190," and ***outputs the key***—"a shared secret key 129c." *Id.*, 34:66-35:5. In this example, the token is simply "a temporary value or a number or a string," such as "a timestamp and/or a random number," *id.*, 36:52-58 (the passage

Network-1 itself cites, Op. Br. at 21), which the module may send "as plaintext." *Id.*, 116:27-37. Thus, where the specification classifies token 190 as a "parameter," it is ***not a key*** and is never referred to as a "key"; it is ***an input to the algorithm*** that generates the key—consistent with Samsung's construction. Rangan Decl. ¶¶83, 86.

***Samsung relies on the specification's consistent usage, not lexicography or disavowal.*** Network-1 argues that the specification contains "no lexicography or disavowal," and describes "cryptographic parameters" using "open categories," such that "the disclosed universe of [cryptographic] parameters is the union" of "inputs, or settings, or values." Op. Br. at 13-14. But Samsung does not contend that the patentee acted as its own lexicographer or disclaimed claim scope; it asks the Court to construe the term in alignment with how specification consistently uses it. *See Phillips*, 415 F.3d at 1314-16; *ICU Med.*, 558 F.3d at 1374-75. Tellingly, while Network-1 notes that the specification uses the term "cryptographic parameters" about 360 times" (Op. Br. at 13-14), none of the passages collected by Network-1 and its expert characterizes a ***key*** as a cryptographic parameter; they describe parameters by their role in cryptographic operations. *See, e.g.*, Sundaresan Decl. ¶61 (quoting '869 Patent, 5:23-26, 6:26-30, 6:60-66, 9:47-63, 33:24-32). And, similarly, the "open categories" quoted by Network-1 describe parameters by what they do for the algorithms: "data useful for the operation of cryptographic algorithms 141"; "information for using a key derivation function 141f"; and "values or fields" of the kind shown in Figure 1i. '869 Patent, 85:57-60, 33:56-58, 43:4-8. But again, none refer to "keys" as "cryptographic parameters," That is wholly consistent with Samsung's construction.

***No "negative limitation."*** Contrary to Network-1's suggestion, Samsung does not seek a "negative limitation." Op. Br. at 18-19. Samsung simply asks the Court to define what the claimed parameters are; the fact that keys fall outside the definition does not render it a negative limitation.

Indeed, according to Network-1's logic, a construction of "rise" to mean "going up" would be a negative limitation because it excludes going down. Regardless, the Federal Circuit has held that a negative limitation is proper where warranted. *See, e.g., Regeneron Pharms., Inc. v. Mylan Pharms., Inc.*, 130 F.4th 1372, 1379-83 (Fed. Cir. 2025) (construing "VEGF antagonist" to exclude a "buffer," where "buffer" was a separately recited claim term, and "the specification nowhere g[ave] an example of a single component performing both functions").

### 2. The Claims Distinguish "Cryptographic Parameters" from "Keys"

Regardless of whether it is a negative limitation or not, the exclusion of "keys" from the meaning of "cryptographic parameter" is driven by the language of Claim 1 itself. Across the claim, "cryptographic parameters" and "keys" are treated as different things. For example, limitation 1(b) recites "receiving, from a first server associated with the wireless network, an encrypted profile for the eUICC comprising ***cryptographic parameters***, a module identity, ***and a key K***." Ex. D, '869 Patent, cl. 1. The limitation lists three distinct items, referring to each separately. Rangan Decl. ¶80. Limitation 1(g) similarly recites "generating a symmetric key using a second ECDH key exchange with the second module private ***key*** and the ***cryptographic parameters***." '869 Patent, cl. 1. Thus, the limitation recites two separate algorithm inputs—(1) a key and (2) cryptographic parameters—and outputs a key (the "symmetric key"). Rangan Decl. ¶80. Where, as here, "a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Grp. LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (citation omitted).

Network-1 contends that claim 1 "does not limit the 'cryptographic parameters' to any particular values or value-types," but requires only that they be received in the encrypted profile and used in the second ECDH key exchange. Op. Br. at 11; Sundaresan Decl. ¶57. Under that logic, "cryptographic parameters" would encompass ***whatever*** is received from the first server and

used in the ECDH step, without limitation. But that reading ignores the claim's structure. As Network-1 observes, "[t]he patentee used precise vocabulary throughout claim 1, including 'module private ***key***,' 'network public ***key***,' 'shared secret ***key***,' 'symmetric ***key***,' and '***key*** K.'" Op. Br. at 11. This repeated recitation of "keys" confirms Samsung's point: whenever the patentee meant a ***key***, it said so explicitly. '869 Patent, cl. 1.

### 3. The Dependent Claims Are Consistent with Samsung's Construction

Network-1 points to two dependent claims, 4 and 18, which it argues weigh against Samsung's construction. Op. Br. at 12-13. Network-1 is wrong on both counts.

Claim 4 recites that "the cryptographic parameters comprise an identifier for a set of cryptographic parameters." '869 Patent, cl. 4. Network-1—citing the specification's discussion of token 126c acting as an identifier for a set of cryptographic parameters 126—argues that such an identifier is "a label, not a setting." Op. Br. 12; *see also id.*, at 17 (asserting that identifiers are "neither inputs nor settings."). Not so. An identifier for a set of cryptographic parameters, as the specification describes it, ***is itself*** an input setting: token 126c ***selects*** the set of settings the algorithms will use, just as a cryptographic parameter specifying a named curve ***selects*** the curve. '869 Patent, 46:3–35, 34:34–39, Fig. 1i. The specification confirms that function: a packet "could contain the token 126c ***as an identifier for*** a set of cryptographic parameters 126," sent "instead of sending or receiving the complete set of cryptographic parameters 126." '869 Patent, 102:25-34, Fig. 7 (step 704); *see also id.*, 46:3-35, 132:27-37. Accordingly, token 126c is itself an input setting, since it ***selects the same settings*** that the complete list would provide directly. Claim 4 thus aligns with Samsung's construction. *See* 35 U.S.C. § 112(d); *Phillips*, 415 F.3d at 1314-15.

Claim 18—which specifies that "the cryptographic parameters include a base point G for an elliptic curve" ('869 Patent, cl. 18)—also confirms Samsung's construction. Base point *G* is an input setting, in that it ***sets the elliptic curve*** on which the key exchange runs. *See* Rangan Decl.

¶103 (explaining that base point *G* is one of the SEC-1 domain parameters, "[e]very element of [which] is a structural choice about the curve and the group"). Network-1 argues that a base point *G* is "not a 'setting,'" but rather "one of the numbers the arithmetic is performed on." Op. Br. at 12-13. But this argument relies on a reading of "settings" in Samsung's construction to mean only a choice among options, and excluding numbers or values input into the algorithm. As explained above, this is not correct. Samsung's construction ("input settings for cryptographic algorithms") covers exactly this—i.e., values that are input into the algorithm to ***define how it operates***. And as noted, base point *G* does exactly that. SEC-1 confirms this by listing domain parameters (including *G*) as an ECDH input. Ex. F, SEC-1 §§ 3.2, 3.3.1; Rangan Decl. ¶¶104-105.

#### 4. The Prosecution History of the Incorporated '401 Application Confirms That Parameters Are Distinct from Keys

The '869 Patent cites at least 11 times and incorporates by reference U.S. Patent Application No. 14/039,401 (the "'401 Application"), filed by the same inventor, John Nix. *See, e.g.*, '869 Patent, 24:53-25:3, 25:4-19, 26:1-22; Rangan Decl. ¶90. During '401 Application's prosecution, the Examiner rejected the pending claims as obvious over Xu in view of Jorgensen. Ex. E, '401 FH, 7-14-2015 Office Action at 5-22; Rangan Decl. ¶92. In response, the applicant did not dispute that Xu discloses cryptographic keys. Ex. E, '401 FH, 10-19-2015 Response at 16-17; Rangan Decl. ¶93. Instead, the applicant argued that Xu lacked any disclosure of ***parameters***:

> ***Xu does not use the word "parameter" or the equivalent functionality for a module to receive a set of parameters***, so there is no teaching in Xu of a set of parameters to use with deriving a module public key and module private key. . . . There is no mention of elliptic curves or elliptic curve cryptography in Xu, so there no suggestion the parameters can include a value for an elliptic curve. There is no mention of a key length in Xu, so there is no teaching the parameters can include a key length.

Ex. E, '401 FH, 10-19-2015 Response at 16; Rangan Decl. ¶¶93-94. The Examiner then allowed the claims. Ex. E, '401 FH, 11-9-2015 Notice of Allowability; Rangan Decl. ¶94. The applicant

thus acknowledged that Xu disclosed keys, but maintained it did not disclose parameters—confirming that keys and parameters are distinct. Rangan Decl. ¶¶93-94.

Network-1 dismisses the ’401 Application as “from a different family” and “not in the priority chain” (Op. Br. at 22), but ignores its repeated incorporation in the ’869 Patent. Incorporated material is “effectively part of the host document as if it were explicitly contained therein.” *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305 (Fed. Cir. 2001). Regardless, the ‘401 prosecution shows how the same inventor, writing about the same technology, at around the same time, used the same word: “parameters.” *Phillips*, 415 F.3d at 1317.

Network-1 also attempts to minimize the significance of these statements, arguing the applicant “distinguished Xu for lacking specific parameters” and “did not state that a key can never be a parameter.” Op. Br. at 22. But the applicant’s statements were far broader than Network-1’s characterization; as quoted above, the applicant distinguished Xu as lacking ***any parameters*** despite acknowledging that Xu disclosed keys. This only makes sense if keys are not parameters.

#### 5. The ’780 Patent Supports Samsung’s Construction And Distinguishes “Parameters” from “Keys”

The ’780 Patent—another John Nix patent asserted in this case—describes “cryptographic parameters” in a manner nearly identical to the ’869 Patent:

> Although not illustrated in FIG. 2b and FIG. 2c, a set of ***cryptographic parameters*** can also be ***input into*** symmetric ciphering algorithms 211 in order ***to specify parameters or configurations of the symmetric ciphering algorithm*** 211…

’780 Patent, 37:64-38:2; Rangan Decl. ¶95. That sentence reflects every element of Samsung’s construction: the parameters are “input into” a named cryptographic algorithm and their function is to “specify parameters or configurations” of that algorithm. Rangan Decl. ¶96. Importantly, the above-quoted passage also confirms the distinction between parameters and keys. While Figures 2b and 2c showcase numerous keys, the passage explicitly says “cryptographic parameters” are

"***not*** illustrated" in those figures.'780 Patent, 37:64-38:2, Figs. 2b-2c; Rangan Decl. ¶¶97-98.

### 6. The Extrinsic Evidence Corroborates Samsung's Construction

Two authoritative texts in the cryptography field confirm that a POSITA would understand "parameters" as settings input to the cryptographic operations, with "keys" as separate values generated under those settings. Rangan Decl. ¶¶101-108. SEC-1 explains that each public-key scheme "involves arithmetic operations on an elliptic curve over a finite field determined by some elliptic curve domain ***parameters***." Ex. F, SEC-1 § 3.1; Rangan Decl. ¶102. Over *Fp*, the domain "parameters" are the sextuple $T = (p, a, b, G, n, h)$, which together "precisely specify an elliptic curve and base point." Ex. F (SEC-1) § 3.1.1; Rangan Decl. ¶103.

SEC-1 treats keys, by contrast, as a separate category that depends on the parameters. A key pair is generated for a given set of domain parameters: "[g]iven some elliptic curve domain parameters *T* . . . an elliptic curve key pair (*d*, *Q*) associated with *T* consists of an elliptic curve secret key *d* . . . and an elliptic curve public key *Q*." Ex. F, § 3.2; Rangan Decl. ¶104. Accordingly, for ECDH, the parameters are the input settings that define the curve environment in which the exchange occurs; the public and private keys are distinct inputs used in the exchange conducted under those settings. SEC-1's ECDH primitive—the operation recited in limitations 1(c) and 1(g)—takes separately identified "[v]alid elliptic curve domain ***parameters*** *T*," a private ***key***, and a public ***key*** as inputs. Ex. F, § 3.3.1; Rangan Decl. ¶105. Claim 1 tracks this structure, reciting the private key and parameters as distinct inputs to the second ECDH key exchange. '869 Patent, cl. 1. Boyd-Mathuria, the leading treatise on key establishment, likewise separates publicly agreed "Shared information" (parameters)—the generator *g* of group *G*—from each party's key material. Ex. G (Boyd-Mathuria) at 141-43, Protocol 5.1, Table 5.1; Rangan Decl. ¶107.

Network-1 responds that neither text uses the phrase "cryptographic parameters" or "input

settings," and that SEC-1's "domain parameters" are at most a subset of the parameters the '869 Patent describes. Op. Br. at 23; Sundaresan Decl. ¶¶83-84. But Samsung does not offer these texts as dictionaries for the claim term, or as a complete list of all possible parameters; rather they show how a POSITA conventionally used "parameters" in cryptography—as configurations input into cryptographic operations, distinct from keys. Rangan Decl. ¶¶101, 108.

Network-1, by contrast, relies on a general-purpose dictionary definition of the isolated word "parameter." Op. Br. at 22; Sundaresan Decl. ¶80. That approach is precisely what *Phillips* cautions against, for terms that have "a particular meaning in a field of art." 415 F.3d at 1314, 1321. Even so, the definition supports Samsung: a "parameter" is a "characteristic" used "to customize a program," or "a value that is passed to a routine." A value passed into a routine to configure its behavior is an input setting. Rangan Decl. ¶109.

**7. Samsung's IPR Position Is Consistent With Its Construction Here**

Network-1 asserts that Samsung and Dr. Rangan took "inconsistent positions" in IPR2026-00117. Op. Br. at 19, 21-22. This is a gross mischaracterization of the record.

As a preliminary matter, Samsung did not seek construction of any term, and Dr. Rangan explained—in language Network-1 omits—that no term required construction "to resolve the issues … ***because the prior art discloses or renders obvious the claim limitations under any potential construction*** of the claims." Ex. L, Rangan IPR Decl. ¶59. Terms need be construed "only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). Declining to construe a term the prior art meets under any construction concedes nothing about its scope for infringement. Further, the Board's discretionary institution denial did not reflect any construction. Sundaresan Decl. ¶78.

On the substance, Network-1 incorrectly suggests that Dr. Rangan stated at paragraph 94

of his IPR declaration that "cryptographic keys" are "cryptographic parameters." Op. Br. at 19. In fact, the opposite is true. When Dr. Rangan stated that Nakhjiri's encrypted profile discloses "cryptographic parameters," he explicitly stated that "a POSITA would have understood" the ***"'cryptographic parameters,'"*** to ***"include ECC parameters (curve ID and base point G),"*** specifically omitting any keys. Ex. L, Rangan IPR Decl. ¶94. And in footnote 5 to his statement, he further described the "cryptographic parameters" as settings used in generating keys, but again specifically excluding any keys from the parameters: "In ECC, '***cryptographic parameters***' are conventionally the ***curve identifier*** and ***base point G*** used in key agreement. Ex-1005, 4:51–56; Ex-1011, §§2–3." *Id.* ¶94 n.5. Dr. Rangan's claim chart, annotated below, also confirms his cryptographic parameters mapping (green) and shows that his position here is consistent. *Id.* ¶98:

| Claim element | Nakhjiri | Bradley | Jeong |
|---|---|---|---|
| Encrypted profile with cryptographic parameters, ID, and key K | Profile encrypted by PEK, includes curve ID and base point G and cryptographic keys | ICCID, IMSI, key K | |

**Ex. L, Rangan IPR Decl. ¶98 (excerpted and annotated)**

And in addressing limitation 1(g)'s requirement to use those same "cryptographic parameters" he again identified the parameter as the elliptic-curve starting point (initial point P), not a key. *Id.* ¶¶112-113; *see also id.* ¶165.

## V. <u>CONCLUSION</u>

For the above reasons, the Court should adopt Samsung's proposed constructions.

Dated: November 16, 2026

Respectfully submitted,

By: */s/ Marc J. Pensabene*
Marc J. Pensabene

Ryan K. Yagura (Tex. Bar No. 24075933)
ryagura@omm.com
O'MELVENY & MYERS LLP
400 S. Hope Street
Los Angeles, CA 90071
Telephone: 213-430-6000
Facsimile: 213-430-6407

Marc J. Pensabene (Pro Hac Vice)
New York State Bar No. 2656361
mpensabene@omm.com
Laura B. Gore (Pro Hac Vice)
New York State Bar No. 5172879
lgore@omm.com
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: 212-326-2000
Facsimile: 212-326-2061

Liam K. Azartash (Pro Hac Vice)
lazartash@omm.com
California State Bar No. 346952
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: 202-383-5300
Facsimile: 202-383-5414

Frances Mackay (Tex. Bar No. 24109494)
fmackay@omm.com
O'MELVENY & MYERS LLP
2801 North Harwood Street, Ste. 1600
Dallas, TX 75201-2692
Tel.: (972) 360-1900
Fax: (972) 360-1901

Melissa Smith (Tex. Bar No. 24001351)
melissa@gillamsmithlaw.com
GILLAM AND SMITH LLP
303 South Washington Avenue

Marshall, TX 75670
Telephone: 903-934-8450
Facsimile: 903-934-9257

***Attorneys for Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on November 16, 2026.

*/s/ Marc J. Pensabene*
Marc J. Pensabene